IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VANESSA LANGE, individually and as heir at law to the ESTATE OF GREGORY LANGE, and FELDA LANGE, individually | §<br>§<br>§<br>§ | |
| Plaintiffs | §<br>§ | |
| | § | CIVIL ACTION NO. |
| vs. | §<br>§ | |
| TOM GREEN COUNTY, SHERIFF DAVID JONES, in his individual capacity, SUSAN L. SCHULTZ, SHANNON MEDICAL CENTER, TODD TALLEY, CYNTHIA AVILA, REBECCA CROUCHER, RODWY RICHTER, TODD ALLEN, JESSE BONE, NATHANIEL GALLION, AMY WRIGHT, NICOLE DUDLEY, AMY HARDING, JUSTIN RUIZ, and RAY UPTON, in their individual capacities, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants | § | |

**PLAINTIFFS' COMPLAINT**

Plaintiff Vanessa Lange and Felda Lange, the survivors of Gregory Lange, bring this lawsuit alleging claims under the Eighth and Fourteenth Amendments, Americans with Disabilities Act, and Rehabilitation Act, and state-law medical malpractice claims.

JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental jurisdiction over state law claims).

2.      Venue is proper in this district pursuant to 24 U.S.C. § 1391(b), as Defendant Croucher resides in this district.

PARTIES

3.      Vanessa Lange is the surviving adult daughter of Gregory Lange, and sues in her individual capacity as a statutory beneficiary under the Texas Wrongful Death Act, and on behalf of Mr. Lange's estate, of which she is the sole heir. She is a resident of Orange County, Texas.

4.      Felda Lange is the surviving mother of Gregory Lange, and sues in her individual capacity as a statutory beneficiary under the Texas Wrongful Death Act. She is a resident of Runnels County, Texas.

5.      At the time of his death, Mr. Lange had no minor children, and one adult child, Plaintiff Vanessa Lange. Mr. Lange had no surviving spouse.

6.      Vanessa Lange is the sole heir-at-law to Mr. Lange's estate. He died intestate, and no administration of his estate is pending, as none was necessary.

7.      Plaintiffs Vanessa Lange and Felda Lange bring claims as Wrongful Death Act beneficiaries on their own behalf. There are no other Wrongful Death Act beneficiaries, as Mr. Lange was not married, Vanessa is his only surviving child, and Felda is his only surviving parent. They bring suit on behalf of all possible Wrongful Death Act beneficiaries.

8.      Tom Green County is a political subdivision of the State of Texas.  The County funds and operates the jail, employs and compensates the jail staff, and is charged with ensuring that, at all times, the jail remains in compliance with federal and state law. The County is a recipient of federal funds. The County can be served through the County Judge, Steven Floyd, at 122 W. Beauregard, San Angelo, TX 76903.

9.    David Jones was the Tom Green County Sheriff at all relevant times, and acting under color of law and as a representative of Tom Green County. He is sued in his individual capacity for damages. He is a resident of Tom Green County.

10.    Todd Allen was the jail administrator at the jail at all relevant times, and acting under color of law and as a representative of Tom Green County. He is sued in his individual capacity for damages. He is a resident of Tom Green County.

11.    Anna Harding was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. She is a resident of Tom Green County.

12.    Jesse Bone was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. He is a resident of Tom Green County.

13.    Nathaniel Gallion was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. He is a resident of Runnels County.

14.    Amy Wright was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. She is a resident of Tom Green County.

15.    Nicole Dudley was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. She is a resident of Tom Green County.

3

16.     Justin Ruiz was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. He is sued in his individual capacity for damages.

17.     Ray Upton was a jailer at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. He is sued in his individual capacity for damages. He is a resident of Tom Green County.

18.     Todd Talley was a nurse working at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. He is sued in his individual capacity for damages. He is a resident of Ector County.

19.     Cynthia Avila was a nurse working at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. She is a resident of Tom Green County.

20.     Rebecca Croucher was a nurse working at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. She is a resident of Brazos County.

21.     Rowdy Richter was a nurse working at the Tom Green County jail at all relevant times, and acting under color of law and as a representative of Tom Green County. She is sued in her individual capacity for damages. He is a resident of Tom Green County.

22.     Susan Schultz was a nurse practitioner employed by Shannon Medical Center. As part of the course and scope of her employment, she supervised the care provided by the nurses at the jail to inmates. She is a resident of Tom Green County.

23.     Shannon Medical Center employed Schultz, and contracted with the jail to provide medical care to inmates.

FACTS

24.     Mr. Lange was a 58-year-old man who had battled alcoholism his entire life. His body was physically dependent on alcohol, causing physiological changes to his body. He would drink a case of beer each day. Because of his alcoholism, he had extreme difficulty holding a job, caring for himself, and performing other major life activities. When he quit drinking, he would experience significant withdrawal symptoms, including hallucinations, confusion, and disorientation.

25.     Despite his alcoholism, Mr. Lange was a dedicated public servant. For twenty years, he served as the elected Justice of the Peace for Runnels County, Texas.

26.     Eventually, however, his alcoholism caught up to him. Due to consequences of his alcoholism, he was forced to give up his elected position.

27.     Mr. Lange was eventually convicted on a DWI charge in Tom Green County that required him to serve time in prison. He was taken in to custody of the Tom Green County jail on or about October 8, 2014 pending transfer to a state prison.

28.     Because of his long service to Runnels County, the Runnels County Sheriff's Office asked Tom Green County's sheriff, Defendant David Jones, to house Mr. Lange in the Runnels County jail until he could be taken into custody by the state prison system. Sheriff Jones agreed.

29.    Thus, Mr. Lange was booked into the Runnels County Jail on or about October 8, 2014.

30.    On October 12, 2014, while in the custody of Runnels County, Mr. Lange began to experience severe symptoms of alcohol withdrawal – including delirium tremens. He suffered blurred vision, tremors, confusion, and headaches. "DTs" are a life-threatening medical condition, and require medication prescribed by a doctor and intense supervision by medical staff.

31.    Concerned, the staff at the Runnels County Jail took Mr. Lange to Ballinger Memorial Hospital's emergency room. There, he was treated by doctors who prescribed Librium to be taken every three hours (the typical treatment for alcohol withdrawal and DTs), and provided him discharge instructions to "GET HELP RIGHT AWAY IF: you start to twitch and shake, … you feel sick to your stomach and throw up, [or] you feel lighthearted or pass out." The discharge instructions plainly state to "follow up … with your primary care doctor if conditions do not improve" within one day.

32.    The Runnels County jail knew it could no longer safely care for Mr. Lange because it was a small facility with no on-site medical staff. So the Runnels County jail told Tom Green County it would have to take Mr. Lange back until he could be quickly transferred to prison.

33.    Defendant Sgt. Wright at the Tom Green County jail took the phone call from Runnels County. She learned Mr. Lange was suffering from withdrawals, had been to the hospital, and needed medical attention that Runnels County could not provide.

34.    Upon information and belief, Wright contacted Sheriff Jones and Defendant Todd Allen, the jail administrator, and told them Mr. Lange was being taken

6

into Tom Green County's custody, had been hospitalized for DTs, and would require medical care while incarcerated at the Tom Green County jail.

35.     Allen received an email on October 12 that Runnels County "can't deal with him detoxing" and that Mr. Lange was being taken from the hospital to the Tom Green County Jail.

36.     Thus, both Jones and Allen knew that Mr. Lange was in their facility, was suffering from a serious medical condition, and knew from the experience of other sick inmates dying in the jail that the jail was a dangerous place for people like Mr. Lange.

37.     When he was booked in to the Tom Green County jail, Mr. Lange reported he had been suffering from alcohol withdrawal, and had just been released from the hospital. The officer who booked him noted he seemed "woozy" and that "his hand was shaky" when he signed paperwork.

38.     The officer who escorted Mr. Lange to his cell noted he had "trouble walking," and improvised using a laundry cart as a walker to assist him.

39.     Likewise, Jones, Allen and Wright would have known Mr. Lange received discharge instructions from Ballinger Memorial Hospital warning to "GET HELP RIGHT AWAY" if symptoms of DTs returned (including being "shaky" or "twitching"), and a prescription for Librium to be administered every three hours.

40.     The medical care prescribed by doctors at the hospital – Librium, examination by a doctor if his conditions did not improve, and observation for return of DT symptoms – were a reasonable accommodation for Mr. Lange's alcoholism that was necessary for him to access the programs and services at the Tom Green County jail. Tom Green County did not provide this reasonable accommodation.

41.     For the first day he spent in the jail, no one gave Mr. Lange the Librium the emergency room had prescribed.

42.     On October 13, Defendant Croucher, a licensed vocational nurse, noted that Mr. Lange had been brought to the jail from the hospital, and told her supervisor, Defendant Talley, another nurse, that he would need to order the Librium because "Mr. Lange would be detoxing from alcohol." Talley, who, as a nurse, could not prescribe medication, practiced under the supervision of Defendant Schultz, a nurse practitioner at the local hospital, Shannon Medical Center, and required her prescription authority to order an inmate's medication. Schultz was responsible for supervising Talley and ensuring he provided care to his patients that met the community standard of care. Despite knowing that Mr. Lange needed Librium every three hours, and had not been receiving it for over a day, Talley did not order the medication on October 13.

43.     In Texas, nurses have an extremely limited scope of practice. They cannot diagnose conditions or prescribe treatment. *See* Tex. OCCUPATIONS CODE § 301.002 (defining scope of practice of nurses). Any licensed vocational nurse would know that they essentially cannot do anything more than observe symptoms and report them to a doctor. Talley, Croucher, Avila, and Richter knew that, as nurses, they were unqualified to assess Mr. Lange's condition, and needed to provide him access to a medical provider who could actually diagnose his condition and prescribe care.

44.     Likewise, Jones and Allen knew the jail's infirmary was staffed entirely by nurses, who routinely made medical decisions without consulting a supervising provider.

45.     On October 14, Croucher noted that when the jail received its prescription order, that there was no Librium for Mr. Lange. She told Talley that Mr. Lange still needed his medicine, but did nothing else to actually obtain it for him. Croucher and Talley made this unconscionable decision knowing how dangerous alcohol withdrawal and DTs were when untreated.

46.     On October 14, Defendants Schultz and Talley finally ordered the prescription, but did nothing else to obtain the medicine until it arrived from their pharmacy service. It did not arrive until October 15 – three full days after it was prescribed by the emergency room.

47.     Likewise, Croucher knew on October 14 that Mr. Lange had not received his medication for two days, and would not receive it, at the earliest, until October 15 when the next supply of drugs arrived from the pharmacy. Despite this, she did nothing to help obtain Mr. Lange's medication so he could take it as prescribed.

48.     Predictably, Mr. Lange's condition worsened severely during these three days.

49.     When Croucher gave Mr. Lange his Librium for the first time on October 15, she needed help from an officer to "help [Mr. Lange] sit up." He could no longer raise himself to a sitting position, deteriorating markedly from just a few days earlier.

50.     Later that night, additional officers found Mr. Lange laying on the floor of his cell, completely nude, using his food tray as a pillow. "He was a total mess." The officers reported his condition to their supervisor, Defendant Wright. Despite knowing that Mr. Lange had been brought to the jail from the hospital suffering withdrawal symptoms, and receiving his discharge instructions, she did not follow the discharge

instructions and contact a doctor. Instead, she instructed them to take him to the infirmary – which she knew was only staffed by nurses – and that she would send trustees to clean out his cell.

51.    The officers asked Mr. Lange to stand, but he appeared disoriented, and could no longer walk on his own. They placed him in a wheelchair, put a blanket over him, and took him to the infirmary to be evaluated by a nurse.

52.    In the infirmary, Defendant Talley and Defendant Richter, both nurses, "attempted to complete" an alcohol withdrawal assessment with Mr. Lange. Talley wrote in the medical record that Mr. Lange "is detoxing from alcohol." Talley found Mr. Lange "lying on the bench in the holding cell" "unable to clearly answer my questions." Richter noted he "was unable to communicate clearly." The assessment form they completed assigns various symptoms different point values, and when the points total more than 10, instructs that inmates need to see a medical provider. Talley found Mr. Lange had "moderate" tremors (3 points), moderate anxiety (3 points), and "moderate" agitation (4 points) for a score of 10 points.

53.    Though the symptoms Talley and Richter observed alone required Mr. Lange see a doctor, Talley also wrote on the form "inmate could not answer my questions" and "he couldn't answer any questions clearly and I couldn't understand what he said" – meaning Mr. Lange could not respond to the questions requiring a subjective response (such as "what day is this?" "where are you?" "are you hearing things that are not there?" etc.). The subjective measures make up more than half the "points" a patient can "score" on the form, meaning Mr. Lange obviously was suffering symptoms that required medical care by a provider.

54.     Talley and Richter asked Mr. Lange if he could get out of the wheelchair to take his Librium, but "inmate moaned and shook his head." Richter gave him the medication in the wheelchair by "plac[ing] [the cup] on his lips and inmate opened mouth and medication was given with cup of water." In other words, Mr. Lange had become so sick that nurses had to open his mouth and pour water down his throat to help him take his medication.

55.     Talley and Richter also observed what they believed to be vomit on Mr. Lange's chest, but did not note on the assessment form that Mr. Lange had vomited (though vomiting – according to the form – is also a symptom necessary to assess alcohol withdrawal).

56.     Defendant Richter, a licensed vocational nurse, assisted Talley in the evaluation and also observed Mr. Lange's vital signs.

57.     Talley and Richter reported the symptoms to their supervisor, Defendant Schultz, who supervised them from offsite at Shannon Memorial Hospital. Talley and Richter reported their observations to ask if Mr. Lange "needed to be in the hospital?"

58.     Schultz, without ever examining Mr. Lange, determined that additional testing would be inappropriate because she would need to know "how much fluid he was taking in, whether he had eaten, how much he had vomited," etc. to make an assessment. She did nothing else to assess his condition, though she had been told he was experiencing serious withdrawal symptoms, knew he was only under the care of nurses who could not diagnose his condition or prescribe treatment, and knew (or should have known) that he had been without his prescribed medication (Librium) for over three days when he first arrived at the jail.

59.     Shortly after midnight on October 16, Defendant Bone, a correctional officer, observed Mr. Lange sitting on the floor of his cell, "shaking and unresponsive." Bone told his supervising officer, Defendant Sgt. Harding, that he was concerned about Mr. Lange, and reported his symptoms. Bone did nothing else, including contacting a medical provider who could examine Mr. Lange to diagnose his condition.

60.     Defendant Harding responded "she was aware of Lange's condition and that medical staff was also aware of his condition and state." She did nothing to provide him medical care, despite learning from Bone about these serious symptoms.

61.     Throughout the remainder of his shift, Bone continued to observe Mr. Lange every thirty minutes. "Throughout [his] shift, Lange had seizures, so [Bone] stayed there till he would pass them through to make sure he wouldn't fall off his bed." Bone reported Mr. Lange's condition to the officer who relieved him in the morning, but did nothing to obtain medical care for Mr. Lange despite watching him suffer intermittent seizures the entire night.

62.     At 6 am on October 16, Croucher went to give Mr. Lange his morning dose of Librium. She found him completely nude, laying on his bed. Again, she asked an officer to help prop him up so he could swallow his medication. She did nothing else to obtain care for him, though his condition was obviously deteriorating.

63.     At noon on October 16, shortly before noon, at the end of Croucher's shift, she administered another dose of Librium to Mr. Lange. She again needed an officer to help get him sitting upright so he could swallow his medication. She again did nothing to provide him access to a medical provider who could assess him and make treatment decisions.

64.     Shortly before 6 pm, Avila, another nurse, asked Defendant Upton, a jailer, to help her give Mr. Lange his evening dose of Librium. Upton went with her to the cell, and they found Mr. Lange unable to sit up to take his medication. Because he was unable to sit upright by himself, they lifted the "property box" in the cell up on to the bunk, and placed it behind Mr. Lange for him to lean back on. Upton reported Mr. Lange's condition to other officers working the shift, but he and Avila did nothing else to provide Mr. Lange necessary medical care.

65.     Between 9 pm and 9:45 pm, Richter and Avila found Mr. Lange again needed help sitting up to take his medicine. Mr. Lange said he was thirsty, so Richter poured water in his mouth so Mr. Lange could drink. Aware Mr. Lange would fall off the bed, Richter, Avila, and Defendant Ruiz lifted his mattress of the bunk and placed it on the floor for Mr. Lange to lie on.

66.     Richter, Avila, and Ruiz noticed Mr. Lange's left eye was swollen, and he told them he had fallen in the cell. Avila noted Mr. Lange was "unable to hold himself in an up-right position," and was told by another inmate that Mr. Lange had "fallen the night before and he had not eaten in about 4 days." They did nothing.

67.     Avila, Richter, and Ruiz saw Mr. Lange had difficulty answering "yes" and "no" questions. They did nothing.

68.     Instead of contacting medical staff actually capable of assessing him – or calling EMS in light of his emergent symptoms – Richter, Avila, and Ruiz simply moved his mattress to the floor because they expected he would fall again. Defendant Gallion was called to the cell to help move the mattress to the floor, and also observed Mr.

13

Lange's poor condition. They did nothing to assist Mr. Lange, and certainly did not contact a medical provider or EMS.

69.     Rather, Avila, Richter, Ruiz, and Gallion reported Mr. Lange's condition to their supervisor, Sgt. Dudley.

70.     Richter told Dudley about Mr. Lange's condition, and that he had also fallen the day before. Dudley decided to keep Mr. Lange in his cell, "because he would have easier access to the restroom." She did nothing to provide him access to medical care, including access to a provider who could examine him and diagnose his condition.

71.     Shortly after midnight on October 17, Mr. Lange was found unresponsive in his cell. He had no pulse. The jailers finally called EMS, and Mr. Lange was taken to Shannon Medical Center's emergency room.

72.     Mr. Lange was placed in the ICU, and – unsurprisingly – diagnosed with delirium tremens, as well as a host of other serious medical problems caused by the jail's indifference to his withdrawal symptoms.

73.     The next day, October 18, learning there was no hope Mr. Lange would recover, his family made the difficult decision to withdraw life support. He died.

74.     Had Mr. Lange been brought to the hospital sooner, he would have lived. The care – or lack thereof – he received at the jail proximately caused his death.

75.     Unfortunately, Mr. Lange was not the only prisoner to die due to denials of medical care at the jail. During 2014 alone, two other inmates died at the jail when they were denied medical care. When asked about these deaths, Sheriff Jones told reporters that only one prisoner had died at the jail – deliberately ignoring that another

14

two people (including Mr. Lange) were hospitalized and died because of the jail and nursing staff's indifference to inmates' serious medical needs.

76.     Likewise, alcohol withdrawal is an incredibly common problem in jails because many inmates are brought into custody and deprived of alcohol for the first time. Caring for inmates suffering from alcohol withdrawal is a situation that will regularly recur in every jail.

77.     Despite the known and obvious danger of alcohol withdrawal, the County failed to adequately train staff at the jail. Sheriff Jones told the press the jail had a 47% turnover rate in 2013 because it failed to pay competitive wages, meaning almost half of jailers had less than one year of experience. Upon information and belief, many of these jailers had not completed the basic training required to serve as a jailer in Texas – including critical topics such as alcohol withdrawal, nurses' scope of practice, and providing medical care to seriously ill inmates, like Mr. Lange. The Sheriff and Allen were well aware of this serious problem, and that inmates were denied medical care, and had died, as a result.

78.     Furthermore, the County had a policy, practice, and custom of denying inmates' medical care beyond what could be provided at the jail's small infirmary. If inmates suffered a medical problem that one of the nurses in the small infirmary could not treat, inmates would routinely be denied access to actual doctors and appropriate medical care, and instead only see nurses who could not diagnose conditions or prescribe treatment for patients.

79.     Moreover, the nurses at the jail had a policy, practice, and custom of failing to adequately evaluate inmates who were seen, and ignoring inmates' serious

15

medical conditions. Here, for example, multiple nurses watched Mr. Lange's condition obviously deteriorate over the course of several days, and only once contacted a provider (who they then knew never actually examined Mr. Lange).

80.    Likewise, the jail had a policy, practice, and custom of training officers that if an inmate was being seen by a vocational nurse – no matter what they otherwise knew about the inmate's condition – that they were not to contact outside help. As demonstrated here, officers who consistently saw Mr. Lange in dire straights, and were told about his progressively worsening systems, simply contacted the nursing staff though they knew the nurses were unable to provide adequate care.

81.    As the Sheriff, Defendant Jones and his deputy, Jail Administrator Allen, were well aware of each of these policies, practices, and customs that denied inmates access to medical care, but refused to correct them to ensure constitutional conditions existed in the jail.

82.    Each of the above described policies, practices, and customs were the moving force behind Mr. Lange's death.

CAUSES OF ACTION

A.  EIGHTH AND FOURTEENTH AMENDMENT – 42 U.S.C. § 1983 AS TO
TOM GREEN COUNTY

(Plaintiffs' *Monell* Claims Based on County Policies, Practices, and Customs)

83.    Tom Green County consistently failed to provide adequate resources for the safe operation of the jail. High-ranking County officials, including the Sheriff, Commissioners Court and County Judge, knew that the jail was understaffed, failed to provide medical care to prisoners, and had no policies regarding providing prisoners meaningful access to medical care.

16

84. The Sheriff, the county's policymaker for the jail, knew about the policies of understaffing, failing to provide medical care to prisoners, and failing to train officers and nurses about critical, common medical problems like the dangers of alcohol withdrawal.

85. The County's policy, practice, and custom was to violate the Eighth and Fourteenth Amendment rights of prisoners at the jail, like Mr. Lange, by denying them meaningful access to medical care by:

    a. Providing obviously inadequate medical care to prisoners experiencing objectively serious medical conditions (such as vomiting, falls, seizures, tremors, and alcohol withdrawal);

    b. Chronically understaffing the jail, inevitably ensuring inadequate access to medical care;

    c. Refusing to pay for medical treatment outside the jail, even when prisoners suffered serious injuries or illnesses, and knowing that the nurses practicing at the jail were incapable of treating prisoners medical conditions;

    d. Failing to adequately staff the jail's infirmary with medical professionals with an appropriate scope of practice;

    e. Failing to train jailers and nursing staff about the known and recurring danger of alcohol withdrawal, failing to train officers' about nurses scope of practice, and providing prisoners access to medical care; and,

    f. Failing to supervise corrections officers and nursing staff.

86. These conditions were sufficiently well-known and pervasive to constitute policymakers' intended conditions and practices at the Tom Green County Jail. These practices and conditions had no legitimate penological purpose and were actually known, constructively known, and/or ratified by Tom Green County and its policymakers (including Sheriff Jones). Moreover, the known and obvious consequence of these policies was that Tom Green County sheriff's officers would be placed in recurring

situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result. The policymakers, including Sheriff Jones, acted with deliberate indifference to the rights of the County's prisoners.

87.     These conditions were the result of deliberate choices made by County policymakers, including the Sheriff, despite the obvious danger to inmates housed inside the jail. Policymakers at the jail knew of these dangerous conditions of confinement but failed to correct these hazardous conditions.

88.     The jail's system for providing inmates access to medical care was known by County policymakers to be wholly inadequate to treat inmates with serious, chronic medical conditions.

89.     The County's deliberate indifference to the serious medical needs of its prisoners in the jail, like Mr. Lange, proximately caused him to needlessly suffer and die.

B.     EIGHTH AND FOURTEENTH AMENDMENT – 42 U.S.C. § 1983

(County Liability Based on Constitutional Violations by the Policymaker)

90.     Sheriff Jones, was the supervisor of the officers at the jail and the County's policymaker. He knew the officers at the jail were not adequately trained in providing inmates access to medical care or the dangers of alcohol withdrawal. He knew this made conditions in the jail dangerous for inmates with serious medical needs, like Mr. Lange. Despite this known hazard, he did nothing to ensure the officers were adequately trained.

91.　　Moreover, Jones failed to adequately supervise the officers working under his command at the jail. He knew officers routinely ignored inmates' serious medical conditions, and that prisoners died as a result.

92.　　Instead of taking any action to correct this serious problem, Sheriff Jones made public statements denying inmates died of conditions in the jail.

93.　　Despite these known and obvious problems, Jones did nothing to protect the rights of prisoners in the jail.

94.　　As a direct and proximate result of the County's policies, Mr. Lange suffered and died.

C.　　EIGHTH AND FOURTEENTH AMENDMENT – 42 U.S.C. § 1983
(As to Defendants Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, and Upton)

95.　　Defendants Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, and Upton knew Mr. Lange was suffering objectively serious medical problems at the jail. They each knew he was suffering from alcohol withdrawal, and had numerous obviously severe symptoms, including an inability to sit upright, and an inability to take his medication without assistance.

96.　　Despite these obviously serious medical problems, Defendants Defendants Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, and Upton ignored Mr. Lange's serious medical condition, and denied Mr. Lange access to medical care by competent providers.

19

97.     Defendants Defendants Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, and Upton were deliberately indifferent to Mr. Lange's serious medical needs, and denied him access to meaningful medical care.

98.     As a direct and proximate result, Mr. Lange died.

### D.    AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT

99.     Tom Green County has been, and is, a recipient of federal funds, and thus covered by the mandate of the Rehabilitation Act.  The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services and reasonably modify such facilities, services and programs to accomplish this purpose.  29 U.S.C. § 794 (2008).

100. Further, Title II of the ADA applies to Tom Green County and has the same mandate as the Rehabilitation Act.  42 U.S.C. § 12131 *et seq.* (2008).

101. The Tom Green County Jail is a facility, and its operation comprises a program and service, for Rehabilitation Act and ADA purposes.

102. For purposes of the ADA and Rehabilitation Act, Mr. Lange was a qualified individual regarded as having a medical condition (alcoholism) that substantially limited one or more of his major life activities.  Defendant Tom Green County knew Mr. Lange: was experiencing "DTs"/delirium tremens and hallucinations in the jail; and suffered from alcoholism and was physically dependent on alcohol.  Despite this knowledge, Tom Green County's officers intentionally discriminated against him, under the meaning of the ADA and Rehabilitation Act, by failing and refusing to provide him any medical treatment (including the Librium prescribed by the hospital), failing to train staff at the

20

jail to accommodate inmates' disabilities (including alcohol withdrawal), or otherwise accommodating his disability to save his life.

103.    As alleged above, Tom Green County failed and refused to reasonably accommodate Mr. Lange's mental and physical disabilities while in custody, in violation of the ADA and Rehabilitation Act.  That failure and refusal proximately caused his death.

104. As alleged above, Tom Green County violated the ADA and the Rehabilitation Act as it failed, and refused to reasonably modify its facilities, services, accommodations, and programs to reasonably accommodate Mr. Lange's physical disabilities, including not providing any treatment or accommodation for his alcohol withdrawal.  These failures and refusals, which were intentional, proximately caused his death.

105. Mr. Lange died as a direct result of Tom Green County's intentional discrimination against him.  Accordingly, Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

### E. NEGLIGENCE/MEDICAL MALPRACTICE
(As to Defendant Schultz and Shannon Medical Center only)

106.    Plaintiff brings negligence and medical malpractice claims against Defendant Schultz and Shannon Medical Center, pursuant to Texas state law.

107.    To the extent Schultz and Shannon Medical Center provided Mr. Lange any medical care at all, the injuries and damages he suffered were directly and proximately caused by the negligent acts and/or omissions of Schultz and Shannon Medical Center.

108.   To the extent any treatment providers at Shannon Medical Center, including Schultz, became aware of Mr. Lange's medical condition, those providers were employed by Shannon Medical Center and acted in the course and scope of their employment with Shannon Medical Center. Therefore, Shannon Medical Center is vicariously liable for their negligent acts.

109.   To the extent Mr. Lange was provided any medical care at all by Schultz, the care Schultz provided him fell well below the applicable standard of care due to one or more of the following acts or omissions, among others, which proximately caused Mr. Lange's damages:

a.   Failing to and/or delaying evaluation of his medical condition, including failure to make a basic examination of his condition;

b.   Failure to treat his medical condition;

c.   Failing to refer Mr. Lange to a competent medical provider (i.e. telling the nurses at the jail to call 911);

d.   Failing to timely order the medication prescribed to treat his alcohol withdrawal; and,

e.   Failing to adequately review Mr. Lange's chart for possible withdrawal complications.

110. Plaintiff has complied with all necessary prerequisites for filing a state-law medical malpractice action, including the notice provisions of Texas Civil Practice and Remedies Code Chp. 74. Plaintiff agrees to provide evidence of such notice to this Court if the Judge so requires.

DAMAGES

55.   Plaintiffs are entitled to compensatory damages against all Defendants in the maximum amounts allowed by law.

22

56. Furthermore, Plaintiffs are entitled to punitive damages against Defendants Defendants Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, Schultz, and Upton in the maximum amounts allowed by law.

57. More specifically, as the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs, and were the moving force of the wrongful death of Mr. Lange, Plaintiffs assert claims under 42 U.S.C. § 1983.

58. More particularly, Plaintiff Vanessa Lange, in her capacity as heir-at-law to the Estate of Mr. Lange, asserts a survival claim on behalf of the Estate of Gregory Lange, which has incurred damages including, but not limited to, the following:

- past physical pain and suffering;
- past mental anguish;
- medical expenses;
- funeral and/or burial expenses; and
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

59. Plaintiffs, in their individual capacities asserting wrongful death claims, have incurred damages including, but not limited to, the following:

- past and future pecuniary loss;
- past and future mental anguish;
- past and future loss of companionship, support, society, services, and affection of Mr. Lange; and,
- attorneys' fees and costs pursuant to 42 U.S.C. §1988, or as allowed by law.

## ATTORNEYS' FEES AND COSTS

60. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover attorneys' fees and costs against Defendants.

## PRAYER FOR RELIEF

THEREFORE, Plaintiff requests that the Court:

A.　　Award compensatory damages against the individual Defendants and Defendant Tom Green County;

B.　　Award punitive damages against the individual Defendants (Defendants Jones, Allen, Talley, Avila, Bone, Harding, Croucher, Richter, Gallion, Wright, Dudley, Ruiz, Schultz, and Upton);

C.　　Award pre-judgment and post-judgment interest at the highest rate available under the law;

D.　　Find that Plaintiffs are the prevailing party in this case and award them attorneys' fees, court costs, expert costs, and litigation expenses; and,

E.　　Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Dated: September 26, 2016.

Respectfully submitted,

Edwards Law
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
Tel.　　512-623-7727
Fax.　　512-623-7729

By: /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
SCOTT MEDLOCK
State Bar No. 24044783

ATTORNEYS FOR PLAINTIFFS

24